# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) Plaintiff, ) | Case No. 2:09-cr-00125-PMP-PAL |
| ) vs. ) | **REPORT OF FINDINGS AND RECOMMENDATION** |
| ) RANDY PRESTON HUGHES, ) | (Mtn to Suppress - Dkt. #22) |
| ) Defendants. ) | |

This matter is before the court on Defendant Randy Preston Hughes' Motion to Suppress Statements for Fifth Amendment Violation (Dkt. #22) filed August 10, 2009. This matter was referred to the undersigned for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. The government filed an Opposition (Dkt. #25) on August 28, 2009, to which Hughes replied (Dkt. #26) on September 3, 2009. The court conducted an evidentiary hearing on October 13, 2009. Lucas Foletta appeared on behalf of the government, and Monique Kirtley appeared on behalf of the defendant who was present and out of custody. The court has considered the Motion, the Opposition, the Reply, the testimony adduced at the evidentiary hearing, and Notice of Supplemental Authority (Dkt. #31) filed the day of the hearing.

## BACKGROUND

Hughes was arrested on a Complaint (Dkt. #4) on February 17, 2009 for unlawful transport of ammunition in violation of 18 U.S.C. § 922(g)(1). Hughes made an initial appearance before the court on February 20, 2009, and the court directed that Hughes submit to a mental health evaluation to determine whether he was a danger to himself or others. After completion of the mental health evaluation, the grand jury returned an Indictment (Dkt. #12), charging Hughes with one count of felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The current motion

seeks to suppress inculpatory statements made by Hughes to Transportation Security Administration ("TSA") and a Las Vegas Metropolitan Police Department ("LVMPD") officer.

## DISCUSSION

### I.   Statement of Facts

On February 17, 2009, at 7:20 p.m., Hughes entered the security checkpoint for the A and B gates at McCarren International Airport in Las Vegas, Nevada.  See LVMPD Voluntary Statement at 1, attached as Exhibit "A" to the Motion to Suppress.  Hughes entered lane one and placed his carry-on bag on the belt for x-ray screening.  Id.  TSA Officer Patrick Murphy observed an "item of interest" and called his supervisor, TSA Officer Connie Heinz.  Id.  Heinz responded and searched Hughes' bag, finding fifty .380 caliber rounds and thirty-nine .22 long rifle caliber rounds.  She asked Hughes why he brought ammunition through the checkpoint, and he replied, "They got through Oakland, so I thought it was ok."  Id.  LVMPD Officer Stacy Rodd arrived and escorted Hughes to the LVMPD sub-station.  Id.  Rodd conducted a records check on Hughes and discovered he was a convicted felon in California.  Id.  LVMPD contacted the Federal Bureau of Investigation.  Special Agent Randy R. Gonzalez arrived and placed Hughes under arrest for felon in possession of ammunition.  Id. at 2.

### II.   The Parties Positions

The Motion to Suppress (Dkt. #24) seeks to suppress all statements made by Hughes to TSA or law enforcement officers on February 17, 2009.  Hughes argues that he was subjected to custodial interrogation without receiving and waiving his *Miranda* rights.  He asserts that under the totality of the circumstances, he was in custody at the time he was questioned, and *Miranda* warnings were, therefore, required.  Specifically, he claims that no reasonable innocent person in his circumstances would have concluded that after brief questioning, he would have been free to leave because law enforcement officers dominated the security area of the McCarren airport, and TSA officials had control of his backpack, boarding pass, and identification.  Second, because he was not advised of his *Miranda* rights prior to interrogation, any statements he made are *per se* inadmissable.  Alternatively, Hughes asserts that even if his encounter with law enforcement was not a custodial interrogation, the government bears the burden of showing Hughes' statements were voluntarily made.

/ / /

1  The government responds that Hughes was not in custody when he made inculpatory statements to law enforcement officers and that *Miranda* warnings were, therefore, not required.  The government claims Hughes was free to terminate his encounter with law enforcement at any time.  Relying on United States v. Palido-Baquerizo, 800 F.2d 899 (9th Cir. 1989), overruled on other grounds, United States v. Aukui, 497 F.3d 955, 960 n. 5 (9th Cir. 2007), the government asserts that the noncoercive nature of airport security screening, the language used by TSA officers to Hughes, the lack of pressure exerted on Hughes by law enforcement, and the brevity of the questioning establish that no custodial interrogation occurred.  The government also argues that like border searches, special rules apply to airport security screening procedures and that routine questioning of passengers boarding an airplane does not violate the Fifth Amendment because of the overriding interests in ensuring safety of the aircraft and its passengers.  The government contends that Hughes' was not in custody and voluntarily accompanied Officer Rodd to the police sub-station. Therefore, statements he made while walking with Officer Rodd and at the sub-station in a non-custodial setting did not require *Miranda* warnings.  Finally, the government asserts that all of Hughes' statements were voluntary and, therefore, admissible.

In reply, Hughes asserts that Palido-Baquerizo is inapposite because the defendant in that case conceded he was not in custody, and, therefore, no *Miranda* warnings were required.  Hughes argues that testimony at an evidentiary hearing will show he was in custody when he made incriminating statements and that *Miranda* warnings were not administered.

### III.   Evidentiary Hearing

At the evidentiary hearing, the government called two witnesses, Connie Heinz, a TSA supervising officer, and LVMPD Officer Stacy Rodd.  The defendant did not call any witnesses or offer any exhibits.

### Testimony of Connie Heinz

Officer Heinz has been a TSA supervisor at McCarren Airport for approximately five years. Her duties include overseeing the screening operation, watching for any distraction at checkpoints, and conducting secondary security searches of bags and passengers.  She has been trained to perform her

///

duties and receives mandatory yearly training in identifying prohibited items of all types including IEDs – improvised explosive devices.

She was on duty on February 17, 2009 on the second shift from 1:00 p.m. to 11:30 p.m. During her shift, she came in contact with Hughes, who she identified in open court. At approximately 7:20 p.m., she responded to a request for a supervisor at lane one of the security checkpoint for the A and B gates because of a suspicious item found on x-ray. When she arrived, the x-ray officer pointed out an item of interest that looked like ammunition. She took possession of the bag, identified the owner, and informed the passenger she would conduct a secondary screening. She and the passenger, Hughes, walked together to a search table where she explained the secondary search procedure. She advised Hughes not to touch the bag or anything in it, and he cooperated. She estimated the secondary search table was approximately eight to ten feet from the x-ray machine where the bag was initially screened. It is an open area visible to the public. Hughes identified the bag as his own and was completely compliant with her procedures.

She unzipped the bag, took a sample of the exterior, and placed it in a machine designed to detect trace explosive material. The sample was negative, and she then checked the inside of the bag, finding two prohibited items – a box of live ammunition and plastic bag of live ammunition. She took possession of the bag, removed the ammunition, and turned it over to bag check Officer Lemmon. Lemmon put the bag through the x-ray machine a second time to make sure it was clear of prohibited items. Lemmon then returned the bag to Hughes.

After Heinz found the ammunition, she asked for Hughes' identification and boarding pass and left the area with them to conduct followup procedures. She notified LVMPD Officer Rodd who was seated at the security podium near the A and B security checkpoint. She also asked Hughes why he brought items through security. Hughes responded that he had brought them through Oakland to Las Vegas, that he knew ammunition was in the bag in Las Vegas, but because he had gotten through the Oakland airport with ammunition, he thought it was okay.

Lemmon gave Hughes the bag back and escorted him to a waiting area where his traveling companion, a female, sat with him. Heinz needed to collect additional information for her report and asked Hughes several more questions. She described Hughes as relaxed, comfortable, and cooperative.

While she was speaking with Hughes, Officer Stacy Rodd arrived and took over.  She estimated no more than five minutes elapsed between her contact with Hughes and Officer Rodd's arrival.  Heinz provided Rodd with the passenger's information and turned over his boarding pass and identification to Rodd after a TSA coordinator went to the office and took a digital photo of the boarding pass, identification, and prohibited items.  She observed Officer Rodd's contact with Mr. Hughes in the seating area.  She described Hughes as becoming "verbally unruly" although not physically.  Rodd said that he would take Hughes to the sub-station, and Heinz accompanied Rodd and Hughes to the sub-station because her office copy machine was not working, and she needed a photocopy.  During the walk to the sub-station, she overheard Hughes say to Rodd that Hughes had purchased the ammunition at a gun show in California and that he knew that it was in his bag.  Hughes made this statement in response to Rodd's question about why Hughes had ammunition in his bag.  When she got to the sub-station, she got her photocopy and left to return to her work station.

     A video of the incident was marked and admitted as government's Exhibit "1."  Heinz testified that it accurately depicts the events of Hughes' screening at the security checkpoint.  She identified the individuals involved at various stages of the encounter.  She did not recall whether she asked Hughes questions about the ammunition in the bag before or after Lemmon took the bag to rescreen it.  She told Hughes she was going to need his boarding pass and identification and that TSA would conduct an investigation.  When she left the secondary screening area to go to Officer Rodd's podium, she had the ammunition and Hughes' boarding pass and identification with her.

     On cross examination, Heinz testified that when she arrived at the x-ray machine on lane one, she looked at the image on the machine and that it appeared to contain ammunition.  She took the bag from the x-ray tunnel, identified its owner, and asked if he had any other belongings.  She waited for the owner of the bag, Hughes, to collect his other belongings and then asked him to go to the secondary screening area.  When asked whether Hughes was free to leave, Heinz testified that he could have chosen to depart.  However, if he had done so, she would have notified LVMPD.  As a TSA officer, she does not have authority to detain a passenger.  However, she did not tell Hughes that she did not have authority to detain him or that he could leave at any time.  She informed Hughes to go to the secondary screening area and told him he could not touch the bag or any of the items in it.

1    At the secondary screening table, she took the items out of Hughes' bag – a backpack. After she
2 found the ammunition, Hughes was still free to leave; however, she would have immediately notified
3 LVMPD if he had done so. After she discovered the ammunition, she asked Hughes why the
4 ammunition was in his bag. She believed she asked Hughes a question to the effect of "why was the
5 ammunition in [his] bag?" She wrote a voluntary statement and reviewed it before she signed it. If the
6 statement says the question she asked was why Hughes brought the ammunition through the security
7 checkpoint, she agreed that was the question she asked.

8    After she asked Hughes for his boarding pass and identification, she did not tell him that he was
9 free to leave. Hughes was reunited with his traveling companion. He was given a general direction of
10 where Heinz wanted him to sit, and he sat with his traveling companion. Heinz then went to her office
11 to make calls and tried to make a copy of his documents. She estimated she was gone approximately
12 three minutes. She also estimated that the secondary search took approximately three to five minutes to
13 conduct and that Officer Lemmon took three to five minutes to clear the bag a second time after the
14 ammunition was discovered and removed.

15    **Testimony of Officer Stacy Rodd**

16    Officer Rodd is employed by LVMPD at the airport division as a police officer. He has been a
17 police officer for almost twenty-one years and has been assigned to the airport for approximately one
18 year. His duties involve responding to requests for calls from the podium at the termination point of all
19 entrance points of the security gates. He has received training regarding suspicious and prohibited
20 items. He was working at approximately 8:00 p.m. when he came in contact with Hughes, who he
21 identified in open court.

22    Rodd was at the A and B security checkpoint podium when Heinz contacted him, indicating a
23 prohibited item had been found at the checkpoint. Rodd went with Heinz to the area and followed her
24 to where Hughes was seated. Before contacting Hughes, Heinz showed Rodd the live rounds of
25 ammunition she had found. Hughes was not restrained in any way, and there were people coming and
26 going all around. Rodd looked at the ammunition that was recovered and briefly discussed the situation
27 with Heinz. He then went over and talked with Hughes. He described the conversation with Hughes as
28 "pretty much standard." He asked certain background questions to make sure he was dealing with the

6

correct person and that the bag in question was his. Rodd asked if the backpack was Hughes' bag, and Hughes acknowledged it was. He asked Hughes how many rounds were in the bag. While asking these questions, Hughes was not handcuffed. Hughes was sitting while Rodd was standing. Hughes and his girlfriend were a bit concerned because they had a flight leaving soon. Hughes indicated he had a flight that was leaving in twenty or thirty minutes and asked whether he was going to make it. Rodd told him that prohibited items had been found, and he would need to fill out some paperwork and documents. Rodd told Hughes that the paperwork and documents were back in his office and asked Hughes to accompany him to the sub-station to complete the paperwork, indicating there were no guarantees he would make his flight.

Rodd described the paperwork he was required to fill out as a "TSA report" which documents the violation, gets the information and records of the violator or individual who brought the items in, and contact or address information of the individual. He also asked the two TSA employees involved in the contact to complete voluntary statements documenting their findings and other details. Bringing prohibited items to the airport is a civil infraction, which can result in a warning or a fine.

Hughes cooperated and returned to the LVMPD sub-station office at the airport. Hughes' focus while en route was whether he was going to miss his flight. Rodd told Hughes it was necessary to do the paperwork and that they needed to go to the office to fill it out. Rodd believed he was "effective in convincing" Hughes that this needed to be done and that Hughes cooperated and walked back to the office.

While walking to the sub-station, Rodd asked Hughes questions about whether the bag was his and whether the ammunition was his. Rodd also asked Hughes whether he had a firearm that the ammunition could be used for and other followup questions. Rodd testified that Hughes did not want to answer and appeared to intentionally avoid answering questions about ownership of a firearm. Rodd tried to get him to respond by rephrasing these questions several times.

Hughes was not in custody or in handcuffs while walking to the LVMPD office. His female companion was concerned about missing their flight and left the couple's bags with Hughes to check on

///

///

rebooking another flight. After she left, Rodd helped Hughes carry the couple's bags to the sub-station. He estimated it took approximately three minutes to walk to the sub-station office.

When they arrived at the sub-station, he and Hughes went to an interview room where Rodd requested additional information. He had Hughes' identification and a copy of his boarding pass and asked LVMPD staff to run a records check for criminal history. The records check revealed that Hughes had a felony conviction. When the felony conviction was discovered, Hughes was arrested for felon in possession of ammunition. Rodd could not recall whether or not he administered *Miranda* warnings after arresting Hughes. Rodd then contacted Special Agent Randy Gonzalez of the FBI to apprise him of the situation. Agent Gonzalez asked Hughes for specific information, such as the nature of Hughes' felony conviction, and asked for a reference to the criminal history record Rodd had before him. Gonzalez pulled up the same criminal history record and indicated he would review it and consult with the U.S. Attorney's Office. Gonzalez called back a short time later and said he would respond to take Hughes into custody. Rodd turned Hughes over to Special Agent Gonzalez when he arrived.

On cross examination, Rodd testified that he knew ammunition had been found in Hughes' bag before he spoke with Hughes and that he had Hughes' identification and boarding pass. The photo on the I.D. matched Hughes' appearance. Rodd did not mirandize Hughes before asking questions of him concerning whether it was his bag and his ammunition. At the sub-station, Rodd asked Hughes more questions without providing *Miranda* warnings. When asked whether Hughes was free to leave, Rodd responded "we never crossed that bridge" because Hughes was cooperative and voluntarily accompanied him to the sub-station. However, he acknowledged that if Hughes had refused to accompany him to the sub-station or tried to leave, he probably would have been detained. At the sub-station, Rodd asked for a records check to be run to see if Hughes had any prior violations of this type and whether he had any outstanding warrants. He estimated the records check took five to fifteen minutes to complete. He asked for it to be run within a couple of minutes of arriving at the sub-station. At the time of his contact with Hughes, Rodd was in uniform and visibly armed.

///
///
///

## IV. Applicable Legal Authority

### A. Defendant's Statements.

In Miranda v. Arizona, the United States Supreme Court held that the prosecution may not use a defendant's exculpatory or inculpatory statements stemming from custodial interrogation unless it demonstrates procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination were used. Miranda v. Arizona, 384 U.S. 436, 444 (1966).

The government has the burden of proving, by a preponderance of the evidence, whether a confession is voluntary. Lego v. Twomey, 404 U.S. 477, 489 (1972). The government also bears the burden of establishing, by a preponderance of the evidence, that a defendant waived his protection against self incrimination under *Miranda*, or that *Miranda* warnings were not necessary. Colorado v. Connelly, 479 U.S. 157, 158, 168-69 (1986).

### B. The Requirement for *Miranda* Warnings

*Miranda* warnings are necessary when a suspect in custody is interrogated by police. Thompson v. Keohane, 516 U.S. 99, 102 (1995). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom. United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). In determining whether a suspect was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

The determination of whether a defendant is in custody for purposes of the requirement to provide *Miranda* warnings is determined by examining the objective circumstances of the interrogation. Stansbury, 511 U.S. at 323. Because the courts are directed to examine the objective circumstances of the interrogation, the subjective views of either the suspect or the interrogating officer are not relevant to the determination of whether the defendant was in custody. Id.; see also United States v. Leasure, 122 F.3d 837, 840 (9th Cir. 1997). In United States v. Butler, the Ninth Circuit identified some of the objective circumstances the court should examine in determining whether the defendant was in custody so as to trigger the requirement for providing *Miranda* warnings. These include language used by the

officers, the physical characteristics of the place where the questioning occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt. 249 F.3d 1094, 1099 (9th Cir. 2001).

*Miranda* warnings are only required once a person in custody is being interrogated by persons the suspect knows are acting on behalf of the state. The Fifth Circuit has held that the defendant bears the burden of proving custody. See United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984). In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court defined interrogation as "express questioning or its functional equivalent." Id. at 300-01.

The Supreme Court and Courts of Appeals have repeatedly emphasized that there are many types of scenarios in which a person is detained by law enforcement officers, is not free to go, but is not "in custody" for *Miranda* purposes. For example, a motorist stopped in a traffic stop is not in custody and questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings. Berkemer v. McCarty, 468 U.S. 420, 439 (1984) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975)). In Berkemer, the officer asked the suspect to perform a field sobriety test, and asked if that he had been using intoxicants. The Supreme Court found *Miranda* warnings were not required, finding an officer is permitted to ask a suspect in a traffic stop "a moderate number of questions to determine his identity, and to obtain information confirming or dispelling the officer's suspicions." Id. Questions of this nature "cannot fairly be characterized as the functional equivalent of formal arrest." Id.

A person detained in a *Terry* stop and frisk is not in custody. United States v. Bautista, 684 F.2d 1286, 1291 (9th Cir. 1982). The Ninth Circuit has held that the detention of an individual by Immigration and Customs officials at the United States border is a non-custodial detention, even though the individual is not free to leave and cannot refuse to be searched. United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001); Chavez-Martinez v. United States, 407 F.2d 535, 539 (9th Cir. 1969) cert. denied, 396 U.S. 858 (1969). The Ninth Circuit has held that with respect to border searches, *Miranda* warnings are not required "unless and until the questioning agents have probable cause to believe that the person questioned has committed an offense." United States v. Leasure, 122 F.3d 837, 840 (9th Cir. 1997), cert denied, 522 U.S. 1065 (1998). The rationale for this rule is that special rules apply at the

10

border. Id. at 840. The courts have held that in the context of border searches and other administrative searches, the question of whether interrogation is "custodial" should be interpreted in light of the strong governmental interest involved. See United States v. Lueck, 678 F.2d 895, 899 (11th Cir. 1982). As the Eleventh Circuit explained, "[i]nterrogation at the border constitutes one notable exception to the constitutional protection of *Miranda*. Because of the overriding power and responsibility of the sovereign to police national borders, the Fifth Amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States."

The Ninth Circuit has not yet decided whether *Miranda* warnings are required in an airport security screening context. However, the Ninth Circuit has held that airport screening searches are constitutionally reasonable administrative searches because they are "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent highjackings. United States v. Davis, 482 F.2d 893, 908 (9th Cir. 1973); United States v. Marquez, 410 F.3d 612, 616 (9th Cir. 2005).

In United States v. Aukai, 497 F.3d 955 (9th Cir. 2007), an *en banc* decision clarified that the reasonableness of airport security searches "does not depend, in whole or in part, upon the consent of the passenger being searched." Id. at 957. The court reasoned that airport screening searches are mandated by federal law. See 49 U.S. § 44901; 49 C.F.R. § 1540.107. TSA has been given the responsibility by Congress to ensure the safety of airline passengers and airline and airport personnel. Id. at 956. A passenger's election to attempt entry into a secured area subjects the passenger to an airport screening search. Id. at 961. "Under current TSA regulations and procedures, that election occurs when a prospective passenger walks through the magnetometer or places items on the conveyor belt of the x-ray machine." Id. Airport screening searches are administrative searches which do not require individualized suspicion of wrongdoing. Id. at 958. Although the scope of airport screening searches is not limitless, "[a] particular airport security screening search is constitutionally reasonable provided that it 'is no more extensive nor intensive than necessary, in light of the current technology, to detect the presence of weapons or explosives . . . [and] confined in good faith to that purpose.'" Id. at 962 (citing Davis, 482 F.2d at 913).

/ / /

The Eleventh Circuit has squarely held that an airline passenger delayed in boarding an airplane while going through security search procedures is not detained or in custody "so as to require that *Miranda* warnings be given before any questioning occurs." United States v. Vigil-Montanel, 753 F.2d 996, 998 (11th Cir. 1985). The Eleventh Circuit has found this situation "analogous to routine interrogation at the border, where the fifth amendment guarantee against self-incrimination is not offended because of 'the overriding power and responsibility of the sovereign to police national borders.'" Id. For the same reason,

> [R]outine questioning of passengers boarding an airplane does not offend the fifth amendment because of the overriding interest in ensuring the safety of the aircraft and its passengers. Routine questions and answers between an airport security guard and a prospective passenger at a security checkpoint are admissible, absent further circumstances indicating that the passenger is in official custody.

Id.

The Ninth Circuit has identified the factors the court should consider in determining whether an individual is in custody: (1) the language used to summon the individual; (2) the extent to which defendant was confronted with evidence of guilt; (3) the physical surroundings of the interrogation: (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. United States v. Kim, 292 F.3d 969, 973-74 (9th Cir. 2002). Applying these factors, the court finds that Hughes was not in custody while going through the brief initial and secondary screening procedures at McCarren Airport. Hughes elected to attempt entry into a secured area of McCarren Airport by placing his carry on baggage and other items on the conveyer belt of the x-ray machine and walking through the magnetometer. The x-ray operator observed what appeared to be ammunition in a backpack he placed on the conveyer belt. The x-ray operator followed TSA procedures and summoned a supervisor who looked at the image on the x-ray machine, asked Hughes whether the bag was his, and directed him to a secondary screening area a short distance away. Officer Heinz waited for Hughes to collect his other items and told him not to touch the bag containing the prohibited items or anything in it. She placed the backpack in a machine designed to detect trace explosive material before examining its contents. Hughes was cooperative and compliant with her instructions. After confirming that the bag did not test positive for trace explosive material, she opened the bag, found the ammunition, and removed it from

the bag. The secondary search occurred in an area visible to the public and took no longer than required to remove the prohibited items and rescreen the bag. The bag was given back to Hughes who was then directed to sit nearby in another publicly visible area. Officer Rodd arrived a few minutes later, observed the ammunition, spoke briefly with Heinz, and then spoke with Hughes.

The court also finds Hughes was not in custody when he spoke with Officer Rodd en route to or in the airport office until after the records check revealed Hughes had a felony conviction. Rodd explained that he needed to fill out some paperwork and asked Hughes to accompany him to the LVMPD office at the airport. Hughes was not accused of a crime or threatened with arrest by TSA or Officer Rodd. Although Hughes and his traveling companion were concerned about missing their flight, Hughes cooperated and walked with Rodd to the office. Rodd assisted Hughes and his companion by carrying their luggage which Hughes' traveling companion left behind while checking on rebooking another flight. Until Hughes arrived at the LVMPD office, the encounters were in an ordinary airport security screening setting in public view of passengers and airport screening personnel involved in screening passengers seeking to board airplanes. Hughes was not handcuffed or subjected to a show of authority while en route to the office. At the office, Hughes was asked to identify himself and answer a modest number of questions to determine why he brought the ammunition through a security checkpoint at the airport. The duration of the encounter was no longer than necessary to determine that Hughes had prohibited items in his bag and to ascertain why. It was not until his felony conviction was discovered in a routine records check that he was arrested for felon in possession of a firearm. There is nothing in the record to suggest Hughes was questioned after his arrest. Under these circumstances, the court finds that Hughes was not in custody at the time he was questioned at the security checkpoint and in the LVMPD office. Although he was not free to leave after placing his items on the conveyer belt, he was not "in custody" for *Miranda* purposes. A reasonable innocent person under the totality of the circumstances presented here would conclude he would be free to go after brief questioning concerning why he had ammunition in his carry on bag.

    **C.**    **Voluntariness**

For a statement to be voluntary, it must be "one that is the product of a rational intellect and free will." United States v. Kelley, 953 F.2d 562, 564 (9th Cir. 1992) (citing Blackburn v. Alabama, 361

13

U.S. 199, 208 (1960)).  In examining the voluntariness of a confession, the court must consider "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." Derrick v. Peterson, 924 F.2d 813, 817 (9th Cir. 1991).  In addition, the Supreme Court has determined that coercive police activity is a necessary predicate to a finding that a confession is not voluntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986).  It is the government's burden to prove that a confession was voluntary by a preponderance of the evidence. United States v. Jenkins, 958 F.2d 934, 937 (9th Cir. 1991) (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)); see also Connelly, 479 U.S. at 168.

The court must examine the totality of the circumstances and "determine whether 'the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.'" United States v. Harrison, 34 F.3d 886, 890 (9th 1994) (quoting United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988)).  There is nothing in the record to support a finding that TSA agents or Officer Rodd engaged in coercive police activity. Hughes was not in custody and was asked a modest number of questions concerning the ammunition in his carry on luggage.  Under the totality of the circumstances, the court finds the government has met its burden of establishing his statements were voluntary.

Based upon the foregoing,

**IT IS RECOMMENDED** that Hughes' Motion to Suppress (Dkt. #22) be DENIED.

Dated this 3rd day of November, 2009.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE